| | |
|---|---|
| TOBY BOATWRIGHT, ) | |
| ) | |
| Plaintiff, ) | CIVIL ACTION NO.: CV208-030 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Toby Boatwright ("Plaintiff"), who currently is incarcerated at the Federal Correctional Institution in Jesup, Georgia ("FCI Jesup"), filed a cause of action against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* The United States of America ("Defendant") filed a Motion for Summary Judgment. Plaintiff filed a Response. Defendant filed a Reply, to which Plaintiff filed a Surreply. For the reasons which follow, Defendant's Motion should be **GRANTED**.

## STATEMENT OF THE CASE

Plaintiff contends employees of the Bureau of Prisons have negligently failed to treat his medical conditions. Plaintiff also contends these employees have not given him proper medical treatment based on non-medical reasons, such as attempting to defray the costs of treating him. Plaintiff further contends the delays in receiving treatment have been "inordinate and unnecessary" and have caused him to suffer

AO 72A
(Rev. 8/82)

severe pain, immobility, and be unable to participate in "normal life activities." (Compl., p. 2). Plaintiff asserts that he was diagnosed with severe narrowing of his spinal canal at the C6-C7 vertebrae in November 2005, and that he did not have an MRI done until May 2006. Plaintiff alleges that the orthopedic surgeon recommended that he have arthroscopic surgery on his knee, and that procedure has not been performed. Plaintiff avers that he was approved for a transfer to a federal medical center for treatment on two (2) occasions, and the transfer requests were denied both times. Plaintiff alleges that staff at FCI Jesup were told to seek local treatment on these occasions.

Defendant asserts that the evidence of record reveals that the medical care Plaintiff received was not negligently given. Defendant also asserts that Plaintiff cannot prevail in this case because he does not present opposing expert information to contest its experts.

## STANDARD OF REVIEW

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004). An issue of fact is "material" if it might affect the outcome of the case, and an issue of fact is "genuine" when it could cause a rational trier of fact to find in favor of the nonmoving party. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004). The court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law.'" Id. at 1260 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party bears the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no genuine issues of material fact. Hickson, 357 F.3d at 1260 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. Id. In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Acevado v. First Nat'l Bank, 357 F. 3d 1244, 1247 (11th Cir. 2004).

## DISCUSSION AND CITATION TO AUTHORITY

Defendant asserts that Plaintiff was seen by an orthopedic surgeon in November 2005, who recommended Plaintiff have an MRI, not surgery, and the surgeon did not indicate urgency or any particular time for the MRI to be done. Defendant also asserts Plaintiff was evaluated in January 2006, and the orthopedic surgeon recommended that Plaintiff undergo arthroscopic surgery on his left knee; however, Defendant asserts, the orthopedic surgeon did not indicate this surgery was needed urgently or within a particular time frame or that conservative treatment could not be tried first. Defendant contends that Plaintiff complained about being in pain on one (1) occasion between the

evaluation and when he had the MRI done, and Plaintiff refused the pain medication the doctor offered. Defendant alleges that the Utilization Review Committee ("URC") at FCI Jesup wanted to send Plaintiff to a medical center for treatment and evaluation after he had his MRI, but the regional URC did not agree. Instead, Defendant alleges, Plaintiff was taken to Savannah for evaluation by Dr. Randolph Bishop, a neurosurgeon, in November 2006. According to Defendant, Dr. Bishop's evaluation "resulted in no definitive finding that surgery was needed." (Doc. No. 25, p. 15). Defendant states Plaintiff saw Dr. Bishop again in January 2007, and he did not indicate an urgent need for surgical intervention and noted that he planned on seeing Plaintiff as needed. Defendant also states that Plaintiff was seen by medical personnel at FCI Jesup and reported that he was "doing fairly well", walking for exercise, and having mild neck and knee pain. Plaintiff was prescribed pain medication, according to Defendant. Defendant avers that Plaintiff had another MRI performed in February 2007, and the results were sent to Br. Bishop. Defendant alleges that no doctor found Plaintiff's neck condition required surgery until after he filed his administrative tort claim. Finally, Defendant asserts that the Declarations of two (2) medical doctors verify that Plaintiff's care met an appropriate standard of medical care.

Plaintiff contends that he has been placed at a severe disadvantage due to the Court's refusal to permit Plaintiff's discovery requests. Specifically, Plaintiff asserts that the Court granted Plaintiff leave to conduct a written deposition upon Dr. Bishop, his treating surgeon. Plaintiff also asserts he contacted a court reporter, and he was informed that Dr. Bishop would not be deposed unless he received a court order or payment. Plaintiff contends he filed a motion for issuance and service of subpoena in

aid of deposition, which was denied. Plaintiff alleges that he is not attempting to depose Dr. Bishop for "pointless purposes and/or vexatious reasons." (Doc. No. 69, p. 3). Rather, Plaintiff alleges, Dr. Bishop's answers to deposition questions are essential to oppose Defendant's Motion for Summary Judgment and will demonstrate the Defendant's negligence. Plaintiff asserts that, even though he was provided with the "temporal opportunity" to depose Dr. Bishop, "that opportunity rang hollow due to the Court's refusal to issue the requested subpoena" to compel Dr. Bishop's attendance at a deposition. (Id. at 5). Plaintiff also asserts that the record before the Court does not demonstrate that Defendant is entitled to summary judgment.

Defendant avers that Plaintiff has not obtained an opinion from a physician or health care provider to support his negligence action, and, thus, he has failed to overcome his burden to defeat its Motion for Summary Judgment. Defendant asserts that Plaintiff has had ample opportunity to depose Dr. Bishop and that the Court has allowed Plaintiff extensions of time to file his expert report.[1] Defendant contends that it is apparent Dr. Bishop is not willing to provide an expert opinion on Plaintiff's behalf in the absence of a Court order or the payment of an upfront fee. Defendant alleges that Plaintiff cannot overcome his burden on summary judgment by what he expects to show at trial. Defendant also alleges that Georgia law requires Plaintiff to use expert testimony to overcome the presumption of due care and to demonstrate negligence. Defendant further alleges that Plaintiff has offered no objective evidence of negligence on its part.

---

[1] Defendant has summarized the extensions the Court has granted to Plaintiff in pages 6 through 8 of its' Reply to Plaintiff's Response to the Motion.

Plaintiff responds that it is not an absolute requirement that a plaintiff provide a contrary expert opinion to create a genuine issue of material fact to preclude summary judgment. Plaintiff asserts that the Court must first decide whether the Defendant has met its burden, as the moving party, before requiring a contrary expert opinion. Plaintiff asserts that the affidavits Defendant submitted are insufficient, as they are conclusory and do not require Plaintiff to respond with a contrary affidavit. Plaintiff also asserts that he has been unable to depose Dr. Bishop, despite this Court's Order authorizing Dr. Bishop's deposition through written questions. Plaintiff contends that his inability to depose Dr. Bishop should preclude the granting of summary judgment in Defendant's favor.

The purpose of the FTCA is to "'provide redress for ordinary torts recognized by state law.'" Stone v. United States, 373 F.3d 1129, 1130 (11th Cir. 2004) (quoting Ochran v. United States, 273 F.3d 1315, 1317 (11th Cir. 2001)). The FTCA is a limited waiver of sovereign immunity rendering the federal government liable to the same extent as a private party. United States v. Orleans, 425 U.S. 807, 813 (1976). An action brought under the FTCA is governed by the law of the state where the negligent act or omission occurred. See Stone, 373 F.3d at 1130. As Plaintiff's claims stem from events which allegedly occurred in Georgia (FCI Jesup), Georgia law governs.

To establish medical malpractice liability under Georgia law, the plaintiff must establish "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." Zwiren v. Thompson, 276 Ga. 498, 499, 578 S.E.2d 862, 864 (2003). "In Georgia, the reasonable degree of care and skill

AO 72A
(Rev. 8/82)

6

required of physicians is that which is ordinarily employed by the profession generally and not such as is ordinarily employed by the profession in the locality or community." West v. Breast Care Specialists, LLC, 290 Ga. App. 521, 523, 659 S.E.2d 895, 897 (2008). Georgia law recognizes a presumption that the medical care was performed in an ordinarily skillful manner, and the "burden is upon the plaintiff to show a want of due care or skill" or diligence. Bowling v. Foster, 254 Ga. App. 374, 377, 562 S.E.2d 776, 779 (2002); Suggs v. United States, 199 F. App'x 804, 807 (11th Cir. 2006). It is insufficient to show that an expert witness "would have done something differently." Id. Finally, the plaintiff must use expert testimony to establish proximate cause, Zwiren, 578 S.E.2d at 865, and "may not rely on his own statements and lay opinions to avoid" dismissal of his claims. Suggs, 199 F. App'x at 808.

Defendant submitted the Declaration of Dr. Martha Chipi, a medical officer at FCI Jesup. According to Dr. Chipi, Plaintiff arrived at FCI Jesup on July 29, 2005, and he had x-rays taken about a month later. Dr. Chipi states a radiologist interpreted the x-rays and indicated Plaintiff had arthritic degenerative disc disease of the lower cervical spine. Dr. Chipi also states that an x-ray report on Plaintiff's left knee showed he had "a previous surgical repair and the joint space was maintained with no significant arthritic changes and no evidence of a fracture." (Def.'s Ex. 9, ¶ 3). Dr. Chipi avows that she reviewed the x-rays, and she determined that there was no particular medical intervention needed at that time (October 2005). Dr. Chipi states that Plaintiff was referred to an orthopedic specialist for his spine, who examined Plaintiff on November 30, 2005, and did not recommend surgery. Dr. Douglas Hein recommended that Plaintiff have an MRI, but he did not recommend Plaintiff have the scan done on an

urgent or emergency basis. (Def.'s Exs. 5, 8). Dr. Chipi states that Plaintiff saw Dr. Hein in January 2006, who recommended Plaintiff undergo arthroscopic surgery on his left knee. (Def.'s Ex. 10). Dr. Chipi states that she examined Plaintiff on January 31, 2006, and he reported having pain of a nine on a scale of one to ten, even though the objective evidence before her did not support Plaintiff's subjective complaints of pain. (Def.'s Ex. 9, ¶ 6). Dr. Chipi also states that she noted Plaintiff had decreased range of motion in his neck and left knee and that he was waiting to have MRI testing. According to Dr. Chipi, she offered Plaintiff medications she thought were suitable to provide him with relief and appropriate pain management, including Tylenol and Motrin, antidepressant medication, and Topomax or Keppra, but Plaintiff refused all of these medications. (Id.). Dr. Chipi also states that Plaintiff had an MRI in May 2006, and the MRI showed Plaintiff had narrowing of his cervical spine. Dr. Chipi noted that the institution's URC determined that Plaintiff should be referred for a transfer to a medical center for follow-up surgery and care for his neck; however, the Regional URC determined that Plaintiff should be seen by a neurosurgeon and that his condition could be treated locally. Plaintiff was taken to Savannah to visit a neurosurgeon for evaluation in November 2006 and in January 2007, but Plaintiff did not have his entire medical file with him at the January 2007 appointment. The neurosurgeon determined that Plaintiff needed to have another MRI, and the repeat MRI was performed on February 8, 2007. Dr. Chipi states that the MRI showed narrowing of Plaintiff's spinal canal at "multiple levels with effacement and slight cord compression[.]" (Id. at ¶ 20). Based on these results, Plaintiff was referred for a transfer to a medical center for follow-up surgery and care. Dr. Chipi also states that the Office of Medical Designations

and Transportation ("OMDT") denied Plaintiff's transfer on March 13, 2007, and medical staff at FCI Jesup were advised to pursue treatment locally. Dr. Chipi noted that Plaintiff was seen at the Chronic Care Clinic ("CCC") in April 2007, where he had pain of three to four on a scale of one to ten and was prescribed ibuprofen. Plaintiff was again referred for a transfer to a medical center, and the OMDT denied this request and advised staff to pursue treatment locally. On June 11, 2007, the consultant neurosurgeon (Dr. Randolph Bishop) reviewed Plaintiff's MRI results and recommended Plaintiff have surgery; however, Dr. Bishop did not recommend Plaintiff have surgery on an urgent or emergency basis. Dr. Chipi asserts that Dr. Bishop "smoothed out" part of Plaintiff's spine, removed part of Plaintiff's spine, and inserted a plate on July 10, 2007. (Def.'s Ex. 9, ¶ 27). The next day, Plaintiff was seen at FCI Jesup and had moderate soreness and a pain level of 4. Plaintiff was next seen at the prison's medical unit three (3) months later. Plaintiff was "feeling well", denied having neck pain, and was not taking any pain medications; thus, his CCC visits were discontinued. (Def.'s Ex. 46). Dr. Chipi states that Plaintiff was walking rapidly, and he had full range of motion in his knee. Dr. Chipi also states that Plaintiff was able to "duck walk" and squat with no problems and his knee injury was assessed as being resolved. (Def.'s Ex. 9, ¶ 29). Dr. Chipi states that Plaintiff usually did not have complaints about pain other than when he was seen at his scheduled CCC visits. However, Dr. Chipi also states that Plaintiff's objective vital signs were inconsistent with and did not support his subjective complaints of pain. Dr. Chipi further states that Plaintiff was offered appropriate pain medications. Dr. Chipi states that she never concluded Plaintiff needed immediate surgery for his

neck, spine, or knee. Dr. Chipi concludes by stating that the care Plaintiff received met "an appropriate standard of medical care." (Id. at ¶ 31).

Defendant also submitted the Affidavit of Dr. Bethzaida Hernandez-Ricoff, the Regional Medical Director for the Southeast Region of the Bureau of Prisons. Dr. Ricoff states that she reviewed Plaintiff's medical records relating to the care and treatment of his neck, spine, and left knee. Dr. Ricoff opines that Plaintiff's medical records do not support any assertions of constant, excruciating pain, and Plaintiff's treatment, surgery, and outcome were appropriate. Dr. Ricoff also opines that Plaintiff received appropriate treatment that was within the applicable standard of care. (Def.'s Ex. 54, ¶¶ 2, 5).

Defendant also submitted copies of Plaintiff's medical records. These records reveal that Plaintiff was seen at the medical unit on numerous occasions after his arrival at FCI Jesup in July 2005. On only three (3) occasions is there objective evidence supporting Plaintiff being in pain on a level greater than 6 on a scale of 1 to 10. (Def.'s Exs. 11, 13, 45). Plaintiff was referred to consultative surgeons, who recommended that Plaintiff have surgery on his spine and his knee, and he had MRIs taken. However, there is no indication that the surgeons recommended Plaintiff undergo surgery immediately and that, if he did not, his injuries would be exacerbated. On June 11, 2007, Dr. Bishop recommended Plaintiff undergo spinal surgery (Def.'s Ex. 43), and Plaintiff had surgery a month later. Plaintiff was offered pain medication, which the medical care professionals at FCI Jesup deemed to be appropriate to manage his objective levels of pain. These medical records also reveal that Plaintiff's knee injury became better without surgical intervention mere months after he had spinal surgery. Additionally, the only post-surgery limitation Dr. Bishop placed on Plaintiff was no lifting

of more than 25 pounds for 4 weeks, and Dr. Bishop cautioned that overhead lifting might be a problem because of the surgery. (Def.'s Ex. 47).

Plaintiff submitted a portion of Dr. Chipi's Responses to his Interrogatories and a portion of the transcript of his deposition. (Pl.'s Exs. 1 and 2). The only thing these exhibits reveal is that Plaintiff brought this cause of action against the United States of America because the medical staff delayed his treatment, and, in his opinion, had the surgeries been performed sooner, his injuries would not have been as extensive. (Pl.'s Ex. 2, p. 4).

The undersigned recognizes Plaintiff's assertion that he does not have to submit a contrary expert report because the summary judgment standard is applicable to this case, and Plaintiff is correct. See LaGrange v. United States, 1999 WL 109567, at *2 (E.D. La. March 2, 1999) (noting that the plaintiff's failure to file an expert report does not preclude his medical malpractice claims) (citing Reinke v. O'Connell, 790 F.2d 850 (11th Cir. 1986)). However, Plaintiff still must come forward with evidence to demonstrate a causal connection between Defendant's alleged negligence and his injuries. Id. Defendant has set forth evidence that it met its duty to provide medical care to Plaintiff and that the proper medical standards and treatment were applied to Plaintiff. In response, Plaintiff has shown nothing which indicates, but for the delay in receiving surgery on his neck and left knee, his injuries would not be as extensive. Plaintiff has failed to overcome his burden of showing the existence of a genuine issue of material fact. Thus, Plaintiff has not met his burden to overcome Defendant's Motion for Summary Judgment.

It is unnecessary to address the remaining portion of Defendant's Motion.

## CONCLUSION

For the reasons which follow, Defendant's Motion for Summary Judgment should be **GRANTED**. Plaintiff's Complaint should be **DISMISSED**.

**SO REPORTED** and **RECOMMENDED**, this __7__ day of August, 2009.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE